

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS HODGES,<br><br>                             Plaintiffs,<br><br>v.<br><br>TODD GLORIA, both in his personal capacity and in his official capacity as the Mayor of the City of San Diego,<br><br>                             Defendant. | Case No.:  23-cv-2065 W (MSB)<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT WITHOUT LEAVE TO AMEND [DOC. 8]** |

      Pending before the Court is Defendant Mayor Todd Gloria's motion to dismiss the First Amended Complaint ("FAC") under Federal Rule of Civil Procedure 12(b)(6). Plaintiff Dennis Hodges opposes. The primary issue is whether Mayor Gloria violated Hodges's First Amendment rights by vetoing Hodges's reappointment to a volunteer municipal board because of statements Hodges made regarding the transgender community.

      The Court decides the matter on the papers submitted and without oral argument. See Civ. L.R. 7.1(d.1). Because the relevant San Diego Municipal Code establishes that

1

Hodges's position on the municipal board is one for which "commonality of political purpose" with the Mayor is an appropriate requirement, the Court finds Defendant did not violate Hodges's First Amendment rights. Accordingly, the Court will **GRANT** the motion to dismiss [Doc. 8] **WITHOUT LEAVE TO AMEND**.

I. BACKGROUND

The following allegations are taken from the FAC.

Plaintiff Dennis Hodges has been involved in law enforcement since 1976, when he began working as a corrections officer in Chicago. (*FAC* [Doc. 7] ¶ 17.) In 1979, he moved to California "and worked his way up through the California Department of Corrections, retiring as a special agent/captain in 2008." (*Id.* ¶ 19.)

"In addition to his public service, Mr. Hodges has dedicated his life to ministry." (*FAC* ¶ 34.) In 2001, he was "appointed Chaplain of the San Diego Police Department… and joined New Creation Church in 1993, where he served as president of the usher board." (*Id.* ¶ 35.) "He then served as an associate pastor from 2005 to 2011," and in "May of 2011, Mr. Hodges was directed by God to plant the Church of Yeshua Ha Mashiach (Jesus the Messiah)." (*Id.* ¶¶ 36, 37.) Hodges "believes that God defines human sexuality, and that men and women are created in the image of God. His religion also holds that God created two sexes: male and female." (*Id.* ¶ 38.) "He is unashamed of his Christian beliefs and has vocalized that transgenderism is a sin like adultery and fornication." (*Id.* ¶ 40.)

On July 25, 2017, Hodges was appointed to the Citizens Advisory Board on Police/Community Relations (the "Advisory Board"). (*FAC* [Doc. 7] ¶¶ 12, 22.) Members of the Advisory Board "serve until his or her successor is duly appointed and qualified." (*Id.* ¶ 30, citing San Diego Municipal Code (S.D.M.C.) § 26.0802(a).) The Advisory Board's purpose is to "study, consult and advise the Mayor, City Council and City Manager on Police/Community Relations crime prevention efforts." (*Id.* ¶ 23, S.D.M.C. § 26.0801(a).) The Advisory Board then "recommend[s] and review[s] policies

and programs designed to make law enforcement sensitive, effective and responsive to the needs of the City." (*Id.* ¶ 24, citing S.D.M.C. § 26.0801(b).)

In addition to serving on the Advisory Board, "[o]n or about March 2021, Joel Anderson, San Diego County Supervisor, asked Mr. Hodges to join the [San Diego County Human Relations Commission (the 'Commission')] because he would bring diversity to the group as an African American." (*FAC* ¶ 32.) Hodges agreed to serve, and the Commission subsequently appointed him. (*Id.* ¶ 33.)

"On November 9, 2021, during Transgender Awareness Month, the Commission discussed an agenda item to amplify the voices of the San Diego transgender community." (*FAC* ¶ 42.) "Pursuant to the Commission's Rules of Order, Mr. Hodges abstained from voting on the motion because of his sincerely held religious belief that humans are to embrace their biological and creational differences as men and women." (*Id.* ¶ 43.)

"On or around April 2022, the Commission revised their Bylaws and added a code of conduct which was approved by the Board of Supervisors." (*FAC* ¶ 44.) Under the Code of Conduct, "Commissioners must refrain from discriminatory and harassing remarks." (*Id.*)

"On May 31, 2022, the Commission, spearheaded by Commission Chair Ellen Nash, circulated a notice of removal of Mr. Hodges to all Commissioners." (*FAC* ¶ 46.) "Ms. Nash claimed, in her letter, that Mr. Hodges violated the Commission's Code of Conduct and Bylaws by saying 'discriminatory and harassing remarks' towards members of the LGBTQ community." (*Id.* ¶ 47.) Hodges alleges the effort to remove him was "premised on a disingenuous narrative that his actions and statements were 'discriminatory' and 'hateful' towards the transgender community." (*Id.* ¶ 48.)

"On June 9, 2022, the Commission held a special meeting to remove Mr. Hodges from the Commission." (*FAC* ¶ 56.) "At the June 2022 special meeting, a majority of the Commissioners refused to remove Mr. Hodges." (*Id.* ¶ 57.) "At a board meeting in June 2023, Commissioner Nicole Murray expressed to the Commissioners that Mr. Hodges

3

should not be on the Commission because of his remarks on the LGBTQ community." (*Id.* ¶ 58.) "In July 2023, the San Diego Union Tribune ('Tribune') wrote an editorial encouraging the removal of Mr. Hodges from the Commission," which Hodges alleges was influenced by Commissioners Nash and Murray." (*Id.* ¶¶ 59, 60.)

On August 8, 2023, "Mayor Tod Gloria used his veto authority, pursuant to Charter of the City of San Diego Section 280, to veto the reappointment of Mr. Hodges to the Advisory Board because of his comments regarding the transgender community." (*FAC* ¶ 61.) "In his memorandum vetoing Mr. Hodges' reappointment, Mayor Gloria explained that because Mr. Hodges 'has made repeated concerning public comments about LGBTQ people – specifically, the transgender community,' he could not 'support [Mr. Hodge's] reappointment to a Board tasked with promoting a positive relationship between the Police Department and the community it serves.'" (*Id.* ¶ 62.)

Hodges contends the "Mayor's veto of Mr. Hodges' reappointment to the Advisory Board was not based on Mr. Hodges' credentials (or lack thereof). Indeed, Hodges has a lengthy background in not only public service, but law enforcement. He is well-suited to serve on the Advisory Board." (*FAC* ¶ 63.)  He also contends his "decision to abstain from voting on a Commission agenda item and his public comments related to his abstention did not interfere with the efficient operation of the Advisory Board." (*Id.* ¶ 64.) Further, Hodges alleges the "Commission and Advisory Board are two separate entities, and his actions and statements were solely related to his position on the Commission." (*Id.* ¶ 65.)

On November 8, 2023, Hodges filed this lawsuit.  (*See Compl.* [Doc. 1].) On December 7, 2023, Defendant Mayor Todd Gloria filed a motion to dismiss. (*See MTD* [Doc. 5].) On December 28, 2023, Hodges filed the FAC, which asserts three causes of action under 42 U.S.C. § 1983 for: (1) Violation of the Free Exercise Clause of the First Amendment to the United States Constitution; (2) Violation of the Free Speech Clause of the First Amendment to the United States Constitution; and (3) First Amendment

Retaliation. (*See FAC.*) On January 11, 2024, Mayor Gloria filed the pending motion to dismiss the FAC.[1]

## II.   STANDARD

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint.  *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Balisteri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).  In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).  The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Well-pled allegations in the complaint are assumed true, but a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

---

[1] Because Hodges filed the FAC, the motion to dismiss the Complaint [Doc. 5] is moot.

### III. DISCUSSION

Although the FAC asserts three separate causes of action, each is premised on the theory that Mayor Gloria retaliated against Hodges based on the exercise of his First Amendment rights. To prevail on his First Amendment retaliation claims, Hodges must state facts establishing the following: "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel School District*, 608 F.3d 540, 543 (2010 9th Cir.). However, "[i]t is settled … that an appointed public official can be removed for engaging in otherwise protected First Amendment activity if 'political affiliation is an appropriate requirement for the effective performance of the public office involved.'" *Lathus v. City of Huntington Beach*, 56 F.4th 1238, 1241 (9th Cir. 2023) (quoting *Hobler v. Brueher*, 325 F.3d 1145, 1154 (9th Cir. 2003)).

In *Branti v. Finkel*, 445 U.S. 507 (1980), the Supreme Court recognized for a second time that an appointed public officials could be removed from their position for otherwise protected First Amendment activity. In *Branti*, the newly appointed Public Defender fired the assistant public defenders because they belonged to a different political party. The assistant public defenders sued claiming a First Amendment violation. The district court recognized that under the Supreme Court's decision in *Elrod v. Burns*, 427 U.S. 347 (1976), certain "policymaking, confidential employees" could be "discharged solely on the basis of their political affiliation." *Branti* at 1291. However, the district court ultimately concluded that the assistant public defenders did not fit within that category and thus enjoined the Public Defender from discharging plaintiffs.

The Supreme Court began its analysis by reaffirming that "party affiliation may be an acceptable requirement for some types of government employment." *Id.* at 1294 (citing *Elrod*, 427 U.S. at 351.) But the Court cautioned that "it is not always easy to determine whether a position is one in which political affiliation is a legitimate factor to

be considered" and that under some circumstances, "a position may be appropriately considered political even though it is neither confidential nor policymaking in character." *Id.* With respect to the assistant public defenders, the Court agreed that political affiliation was not an acceptable requirement because their "primary, if not the only responsibility… is to represent individual citizens in controversy with the State." *Id.* at 1295. In so doing, an "indispensable element" of plaintiffs' job was "the ability to act independently of the government and to oppose it in adversary litigation." *Id.* (quoting *Ferri v. Ackerman*, 444 U.S. 193, 204 (1979).) Accordingly, "whatever policymaking occurs in the public defender's office must relate to the needs of the individual client and not to any partisan political interests." *Id.* "Under these circumstances," the Court concluded that "it would undermine, rather than promote, the effective performance of an assistant public defender's office to make his tenure dependent on his allegiance to the dominant political party." *Id.*

In *Blair v. Bethel School District*, 608 F.3d 540, 546 (9th Cir. 2010), the Ninth Circuit faced a similar claim. There, the plaintiff sued the school board for First Amendment retaliation after it voted to oust him as its vice president because of his criticism of the school's superintendent. It was undisputed that plaintiff's statements about the superintendent were protected by the First Amendment and that the board's decision to remove him as vice president was based on those statements. The court explained, however, that the case was "not a typical First Amendment case" because "the 'adverse action' [plaintiff] is challenging was taken by his peers in the political arena." *Id.* Plaintiff's "fellow Board members wanted a vice president who shared their views. Because [plaintiff] didn't, they removed him by a procedurally legitimate vote." *Id.* at 543–544.

In affirming the district court's dismissal of the plaintiff's claim, the Ninth Circuit recognized that "more is fair in electoral politics than in other contexts" and explained that "we *expect* political officials to cast votes in internal elections in a manner that is, technically speaking, retaliatory, *i.e.*, to vote against candidates whose views differ from

their own." *Id.* at 544. "[T]o accept [plaintiff's] argument is to hold that the First Amendment prohibits elected officials from voting against candidates whose speech or views they don't embrace." *Id.* at 544–545. The court also reasoned that there was "little difference between what the Board's internal vote against [plaintiff] accomplished and what voters in a general public election might do if they too were disaffected by [plaintiff's] advocacy." *Id.* at 545. The court, therefore, concluded that "the First Amendment does not succor casualties of the regular functioning of the political process" *Id.* at 545.

In 2023, the Ninth Circuit decided a case analogous to the one brought by Hodges. In *Lathus v. City of Huntington Beach*, 56 F.4th 1238 (9th Cir. 2023)*,* the court considered whether the First Amendment protects a volunteer member on a municipal board from dismissal by the city councilperson who appointed her and is authorized under the city ordinance to remove her.  Plaintiff Shayna Lathus was appointed by City Councilperson, Kim Carr, to the City's Citizen Participation Advisory Board ("CPAB"). Under the governing municipal code, each councilperson appointed one member to the CPAB, whose mandate was to "provide citizen participation and coordination in the City's planning processes" related to a Department of Housing and Urban Development block grant program.  *Id.* The program addressed issues faced by low- and moderate-income households. *Id.* In carrying out its mandate, the CPAB held regular meetings to "assess the needs of the community," "evaluate and prioritize projects," "obtain citizen input," and "provide specific recommendations" to the City Council. *Id.*

After Lathus was appointed, she was photographed at an immigrants' rights rally standing near individuals believed to be "Antifa." *Id.* at 1239–40. Councilperson Carr instructed Lathus to write a public statement denouncing Antifa, which Lathus did believing she would remain on CPAB. However, Carr then removed Lathus from the board and Lathus sued claiming First Amendment retaliation.  The district court dismissed, finding that "Carr was not politically powerless to disassociate herself from

8

Plaintiff's public actions through a process that authorized appointment and removal in Carr's sole discretion." *Id.* at 1240.

Although *Blair* did not "control the day" because it was factually distinguishable, the Ninth Circuit stated *Blair* was important because "it makes clear that the First Amendment rights of government officials are not absolute." *Latus*, 56 F.4th at 1241. The court cited as an example the Supreme Court's holding in *Elrod* that "employees in 'policymaking positions' may be dismissed for engaging in activities protected by the First Amendment so that 'policies which the electorate has sanctioned are effectively implemented.'" *Id.* (citing *Elrod*, 427 U.S. at 372). The question presented was "whether 'commonality of political purpose' with Carr is an appropriate requirement for Lathus's service on the CPAB." *Id.* The court also instructed that in evaluating the issue, "where a statute establishes a position, the statute is likely to provide the best foundation for classifying it for . . . First Amendment purposes." *Id.*

Based on its review of the relevant city ordinance governing CPAB, the court held that "[b]ecause a CPAB member is thus 'an adviser who formulates plans for the implementation of broad goals,' [citation omitted], a councilperson is entitled to an appointee who represents her political outlook and priorities." *Lathus*, at 1242 (citing *Elrod*, 427 U.S. at 368). This holding was based on two findings. First that CPAB's members spoke to "'the public and to other policymakers on behalf of the official' who appointed them," which indicated "responsiveness to partisan politics and political leaders." *Id.* at 1242. This finding was based on (1) the councilperson's ability to remove without cause the CPAB member who the councilperson appointed; (2) CPAB provided advice on matters of policy; and (3) CPAB solicited public feedback. *Id.* Second, the court found that under the municipal code, CPAB was a "conduit between the community and City Council." *Id.* This was based on (1) CPAB providing advice on a "vital political issue," namely the "provision of housing to low and middle income city residents;" (2) CPAB's directive to "'assess the needs of the community,' 'evaluate and prioritize projects,' 'obtain citizen input,' and 'provide specific recommendations' to the City

9

Council"; and (3) CPAB conducted "'regular monthly meetings' open to the public." *Id.* Accordingly, the Ninth Circuit affirmed the dismissal of plaintiff's First Amendment claims.

Here, the Advisory Board was established by and is governed by San Diego Municipal Code (S.D.M.C.) §§ 26.0801, *et seq.* Thus, these sections guide the evaluation of whether commonality of political purpose is an appropriate requirement for service on the Advisory Board.

S.D.M.C. § 26.0802(a) provides that the Advisory Board consists of fifteen members, all of whom "shall be appointed by the Mayor and confirmed by the Council." *S.D.M.C.* § 26.0802(a). Members then serve for "a two-year term and each member shall serve until his or her successor is duly appointed and qualified." *Id.* However, members who miss three or more consecutive meetings are deemed to have forfeited their membership on the Board "unless good and valid reasons… are… approved by the Council." *Id.* Additionally, under section 280 of Article XV of the San Diego City Charter—passed by voters in 2004 to implement the "Strong Mayor" form of governance, s*ee City Charter* § 250—the "Mayor shall have veto power over all resolutions and ordinances passed by Council," with certain exceptions. Significantly, Hodges does not argue, and this Court is not aware of any municipal code or City Charter provision limiting this veto power in the context of municipal board reappointments. Accordingly, these provisions establish that the Mayor appoints and may veto without cause the reappointment of Advisory Board members.

Next, S.D.M.C. § 26.0801(a) states that the purpose and intent of the Advisory Board is to "study, consult and advise the Mayor, City Council and City Manager on Police/Community Relations crime prevention efforts." Subsections (b) and (c) state that the "Board shall function as a method of community participation in recommending and reviewing policies, practices and programs designed to make law enforcement sensitive, effective and responsive to the needs of the City" and the "Board shall promote and

encourage open communication and cooperation between the Police Department and residents…."

Finally, section 26.0803 lists some of the Advisory Board's "Duties and Functions." These include:

> (c) Make specific recommendations to the Mayor, City Council and City Manager on actions that can be taken to improve relations between police and community.
>
> (d) Review Police Academy and in–service training in human relations and make recommendations to the Mayor, City Council and City Manager.
>
> (e) Develop and recommend strategies to the Mayor, City Council and City Manager for improving City–wide crime prevention efforts.
>
> (f) Develop and recommend to the Mayor, City Council and City Manager strategies for increasing citizen participation in crime prevention efforts.
>
> (g) Develop and recommend to the Mayor, City Council and City Manager education programs designed to inform the public of its rights and responsibilities when coming into contact with police officers.
>
> (h) Develop and make recommendations to the Mayor, City Council and City Manager with respect to community oriented policing.

Based on the above provisions, the Court finds that "commonality of political purpose" with the Mayor is an appropriate requirement for service on the Advisory Board. Just as in *Lathus*, the San Diego Municipal Code and City Charter establish that Advisory Board members speak to the public and other policymakers on behalf of the Mayor.  This finding is supported by the same facts that existed in *Lathus*: (1) the Mayor appoints all Advisory Board members, including Hodges, and is authorized to veto without cause their reappointment; (2) Advisory Board members provide advice on matters of policy on a number of issues involving police and community relations; and (3) by functioning "as a method of community participation in recommending and reviewing policies," the Advisory Board is clearly charged with seeking public feedback.

Additionally, under the San Diego Municipal Code, the Court finds the Advisory Board is a conduit between the community and Mayor's office. This finding is also supported by the same factors that existed in *Lathus*: (1) the Advisory Board provides advice on a vital political issue, specifically Police/Community Relations crime prevention efforts (*S.D.M.C.* § 26.0801(a)); (2) the Advisory Board's directive is to "study, consult and advise," "function as a method of community participation in recommending and reviewing policies, practices and programs," "actively encourage and foster citizen participation in crime prevention efforts," and provide specific recommendations on a number of issues to the Mayor, City Council and City manager (*Id.* § 26.0803 (c)–(h)); and (3) the Advisory Board's meetings are open to the public[2].

In short, each of the facts relied upon by the Ninth Circuit in *Lathus* in holding that commonality of political purpose is an appropriate requirement for CPAB also exists with respect to the Advisory Board. For these reasons, the Court finds that as a matter of law, Hodges cannot maintain his First Amendment retaliation claims against Mayor Gloria.

### IV.  LEAVE TO AMEND

Hodges requests leave to amend. Leave to amend should be given unless it would be futile. *Lathus*, 56 F.4th at 1243 (citing *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004).

As set forth above, the S.D.M.C. and City Charter establish that commonality of political purpose is an appropriate requirement for Advisory Board members. Based on this finding, the Court is unaware and Hodges has not identified any facts Hodges could allege that would state a claim for First Amendment retaliation. Accordingly, leave to amend is not warranted.

---

[2] *See* https://www.sandiego.gov/cab/meetinginfo; *see also* https://www.youtube.com/channel/UC-4gY2k1D1ikzb25QM-O3eg/streams. The Court takes judicial notice of these pages under Fed.R.Evid.201(b).

V.    **SUMMARY & CONCLUSION**

For the reasons discussed above, the Court **GRANTS** Defendant's motion to dismiss the FAC [Doc. 8] without leave to amend.

**IT IS SO ORDERED**.

Dated: June 24, 2024

*[signature]*
Hon. Thomas J. Whelan
United States District Judge